**HARTLEY LLP**
Jason S. Hartley
Jason M. Lindner
101 W. Broadway, Suite 820
San Diego, California 92101
Tel: (619) 400-5822
*hartley@hartleyllp.com*
*lindner@hartleyllp.com*

*Attorneys for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDY GRIFFITH, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| VISA, INC., | |
| Defendant. | |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

NATURE OF THE CASE ............................................................................................... 2

JURISDICTION, VENUE, AND COMMERCE ............................................................ 6

PARTIES ......................................................................................................................... 8

FACTUAL BACKGROUND FOR CLAIMS ................................................................. 8

I.    Debit Transactions ............................................................................................. 8

    A.   How Debit Card Payment Processing Works ......................................... 8

    B.   Debit Networks .................................................................................... 12

    C.   Debit Network Fees ............................................................................ 13

    D.   How Visa Came to Dominate the Debit Network Market .................... 14

    E.   Visa Faces No Meaningful Competition from PIN Networks .............. 15

    F.   Alternative Debit Networks ................................................................ 17

II.   Visa Engages in Exclusionary, Anticompetitive, and Unlawful Conduct to Dominate Debit Transactions in the United States at the Expense of Consumers ..................................... 18

    A.   Visa Has Been the Dominant Debit Network Provider for Over a Decade ................. 18

    B.   Visa Enters Contracts with Banks and Merchants to Hinder Competition.................. 19

       1. Visa Imposes Anticompetitive Contracts on Merchants and Acquiring Banks........... 19

       2. Visa Leverages Anticompetitive Contracts on Issuing Banks ...................................... 22

       3. Visa Successfully Undermined the Purpose of the Durbin Amendment and Maintained its Monopoly Power ................................. 23

       4. Visa Forecloses Competition by Creating Artificial Barriers to Entry ........................ 24

    C.   Visa Leverages its Monopoly Power to Foreclose Innovative Alternative Networks.. 26

       1. Fintech Networks Threaten to Disintermediate Visa's Debit Network ....................... 27

       2. Visa Leveraged its Monopoly Power to Prevent Disintermediation with Staged Digital Wallets ............................................... 28

       3. Visa Pays-Off Potential Competitors with Monopoly Profits to Prevent Competition 30

III.  Anticompetitive Effects ................................................................................. 32

IV.  No Countervailing Factors .............................................................................. 33

V.   Relevant U.S. Debit Markets .......................................................................... 34

    A.   The United States is a Relevant Geographic Market ........................... 34

    B.   Relevant Product Markets ................................................................... 35

       1. General Purpose Debit Network Services Market ........................................................ 35

       2. General Purposes Card-Not-Present Network Services Market ................................... 37

VI.  Visa Has Monopoly Power in the U.S. Debit Markets ................................... 37

VII. Class Allegations ........................................................................................... 40

CAUSES OF ACTION .................................................................................................. 42

RELIEF SOUGHT ................................................................................................................ 47

DEMAND FOR JURY TRIAL ............................................................................................. 47

CLASS ACTION COMPLAINT

Plaintiff Lindy Griffith, on behalf of herself and on behalf of all those similarly situated, for her Complaint against Visa, Inc., alleges:

## INTRODUCTION

1. Consumers across the United States rely on debit cards to make purchases. Since at least 2015, debit cards have been the primary "noncash" payment type used in the United States, accounting for over $4 trillion dollars in purchases in 2021 – almost double the amount in 2015. To process all the debit transactions and transfer the funds from the consumer's bank to a merchant's bank, the parties to the transaction use debit networks.

2. Debit networks ("networks") in their simplest form are the technological infrastructure that enables buyers and sellers of good or services to conduct secure, real-time payment transactions. Network providers impose fees on the seller to process the transactions. These fees are one of a merchant's largest costs of doing business and are routinely passed directly onto consumers.

3. Defendant Visa, Inc. ("Visa") is the largest debit network provider. Visa has engaged and continues to engage in unlawful and anticompetitive conduct that has artificially raised the price of network fees to supracompetitive prices, including but not limited to, monopolizing the debit network market and leveraging its monopoly power to suppress competition by punishing retailers for using alternative networks, entering into contracts to pay off potential competitors or prevent the development of substitute networks.

4. Visa engages in these anticompetitive practices to protect its debit network business, retain its market power, and continue to reap sky-high profit margins fueled by supracompetitive fees. Visa controls the network that connects Plaintiff's and Class members' banks and merchants' banks to facilitate debit card payments and transactions. More than 60% of debit transactions are processed through Visa's debit network each year, amounting to over $7 billion in fees being collected by Visa. Visa's U.S. debit business is its biggest revenue source, earning more than its credit network and any other debit network it runs across the globe. Indeed, Visa enjoys an 83% profit margin on its debit network processing fees.

5. Visa's anticompetitive conduct ensures it continues to dominate the debit network market in the United States without having to meaningfully compete on the price of its fees, driving up

1

CLASS ACTION COMPLAINT

costs for merchants, and in turn, consumers. Visa's anticompetitive conduct forces its debit network, and thus fees, on merchants who do not have a realistic alternative by (1) preventing merchants from diverting significant portions of their debit transactions to alternative, lower-cost networks, without paying substantially increased fees and penalties to Visa; (2) stifling innovation and competition by paying-off would-be competitors from developing additional or alternative debit networks; and (3) preventing actual or would-be competitors from gaining the scale or volume of transactions necessary to actually compete with Visa. As a result, merchants are forced to utilize Visa's debit network and pay their supracompetitive network fees.

6. In response, Merchants pass on the supracompetitive network fees imposed by Visa to consumers by raising the prices of their goods and services.

7. While merchants and consumers suffer, Visa profits. Visa collects more from every debit transaction that is processed over its network than it would under competition. Internal documents obtained by the U.S. Department of Justice show that Visa feared a future involving competition and alternative networks where it would be forced to compete for business by offering lower fees and prices or else be displaced. A future where Visa was dethroned from its status as market leader and could no longer reap its supracompetitive profits was unacceptable, so Visa resorted to unlawful and anticompetitive means to maintain its market power and profits.

8. Visa's anticompetitive conduct allows it to enrich itself at the expense of the American people who ultimately bear the brunt of Visa's debit network fees. Plaintiff brings this case on behalf of herself and those similarly situated to stop Visa's unlawful conduct, redress past harms, and restore competition to the debit network market.

## NATURE OF THE CASE

9. Plaintiff and members of the proposed class use their debit cards to buy goods and services from merchants. Debit card transactions continue to increase in popularity, accounting for a growing number of consumer purchases every year. Consumers can purchase their goods and services in-person at brick-and-mortar stores ("card-present" or "CP" transactions) or online ("card-not-present" or "CNP" transactions).

10. When a consumer uses his debit card to make a purchase from a merchant, the merchant's bank ("acquiring bank" or "acquirer") contacts the consumer's bank ("issuing bank" or "issuer") to transfer the funds from the consumer's bank account to the merchant's bank account. This communication and transfer of funds between the banks is completed on a debit network. Issuing banks decide the networks they will place on their debit cards, while merchants and acquirers decide the networks from whom they will accept debit card payments. For the transaction to work, that is, for the consumers to be able to purchase goods or services with their debit cards, both the issuing bank and the merchant bank must be a part of or use the same network.

11. Not all issuing banks, merchants, and acquiring banks use the same networks. Thus, it is not always the case that a consumer will be able to use his debit card for every transaction. Whether a network is used by an issuing bank, merchant, or acquiring bank is largely dependent on popularity. An issuing bank will only place a network on its debit cards if many acquiring banks and merchants accept the network. Meanwhile, merchants and acquiring banks will only join a debit network if many issuing banks select the debit network on their debit cards. Simply put, an aspiring debit network provider faces a classic chicken-and-egg problem, where success is contingent on gaining massive scale on both sides of the transaction, a feat that is exceptionally difficult. This barrier to entry protects debit networks like Visa, the largest debit network provider from competition.

12. Visa has been the largest debit network in the United States for decades, processing over 60% of all debit transactions in the United States, and over 65% of all card-not-present transactions. The next largest debit network, Mastercard, processes less than 25% of all debit transactions and card-not-present debit transactions in the United States. The remaining debit network providers, primarily PIN networks, make up only a fraction of the remaining debit network transactions.

13. Visa's dominant market share is the product of intentional and calculated steps taken by the company to limit competition and retain its monopoly power.

14. Following the Great Recession, Visa identified two significant threats to its monopoly. Congress's passing of the Durbin Amendment in 2010 was the first threat. The Durbin Amendment

was passed as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 124 Stat. 1376 (2010), with the goal of promoting competition in the debit network industry and providing additional network choices to merchants and acquirers. Specifically, the Durbin Amendment requires issuing banks to include at least two unaffiliated debit networks on every debit card—one on the front of the card and at least one on the back of the card. These networks are aptly referred to as "front-of-card" and "back-of-card" networks.

15. Unaffiliated networks on debit cards would threaten Visa's dominance and monopoly power in the market. If more debit networks were available, Visa's competitors could gain the scale needed to compete, thereby causing Visa to lose volume and fees. Indeed, this was the initial impact of the Durbin Amendment; after it became effective in 2012, Visa initially lost volume to other debit networks that offered lower fees. If this trend had continued, Visa would have lost its market dominance. To counteract these effects, Visa used its power in the market to limit competition and retain its dominance.

16. For a significant number of transactions, Visa is the only network available to connect the consumer's issuing bank to the merchant and acquiring bank. For these transactions, known as "non-contestable transactions," Visa does not face any meaningful competition and can accordingly threaten merchants and acquiring banks with high rates they must accept if they wish to complete the transaction.

17. For the rest of the transactions, known as "contestable transactions," there is more than one network available to complete the transaction between the parties. In a free and fair competitive market, contestable transactions should result in lower fees and innovation to win business. Visa, however, uses its market power over non-contestable transactions to prevent competition.

18. Visa's significant number of non-contestable transactions gives it leverage over merchants and acquirers, who depend on the non-contestable transactions to complete sales, to enter into routing agreements. Absent a routing agreement, the merchant or acquirer pays a list price (also known as a the "rack rate") on each transaction completed on Visa's debit network. However, with a routing agreement, the merchant or acquirer receives a purported discount on its transactions in exchange for committing a meaningful share of all transactions, contestable and non-contestable,

to Visa's debit network. Simply put, Visa threatens punitive rack rates if merchants or acquirers route too many of their contestable transactions to Visa's competition. As a result, merchants and acquirers must choose between signing routing deals or suffering punitive rack rates, thereby stunting Visa's competition from growing in scale and meaningfully competing.

19. Visa's routing agreements ensure it is protected from facing meaningful competition. Visa's routing contracts cover more than 180 of its largest merchants and acquirers, insulating at least 75% of Visa's debit card transactions from competition and foreclosing nearly half of total U.S. debit card volume. Visa internally touts the success of its routing agreements at subverting competition. Visa renewed many of its routing agreements in 2022, thereby ensuring it retains its dominance in the market for years to come.

20. The second threat to Visa's monopoly power was emerging technologies and innovation that could provide more efficient alternatives to the services Visa provides. In addition to frustrating the purpose of the Durbin Amendment, Visa took steps to ensure newer technologies cannot meaningfully compete for market power.

21. Several digital platforms, such as Apple Pay, PayPal, Cash App, and Square provide consumers and merchants an alternative to debit networks, whereby consumers can link their debit card credentials to the product. These digital platforms have been steadily gaining large networks and popularity among consumers and merchants alike.

22. Given the rising popularity of digital platform innovations, Visa worried these companies might gain market power and attempt to dethrone Visa's dominant market position. Visa identified these digital platform companies and their technologies as a substantial threat to its business.

23. To prevent these digital platform companies from becoming actual competitors that could take market power away from it, Visa made agreements with these companies to avoid competition before they had the chance to compete. For example, Visa offers lucrative incentives, sometimes worth hundreds of millions of dollars annually, to potential competitors on the express agreement they will not develop a competing product or otherwise act in ways that could threaten Visa's dominance. Where more than money is necessary, Visa has threatened these potential competitors with additional fees if they develop competing products.

24. Visa's anticompetitive conduct has harmed merchants and consumers in the relevant market in at least three ways. First, in conjunction with the high barriers to entry, Visa exercises its monopoly power in the debit market to harm competition by depriving the market of the scale necessary to compete, by, for example, entering agreements that punish merchants from utilizing potential competitor debit networks to process their transactions. Because Visa-branded cards comprise a substantial portion of all U.S. debit cards and comprise a large portion of merchants' non-contestable transactions, Visa can engage in the above anticompetitive conduct without losing business.

25. Second, Visa's conduct diminishes competition in a substantial portion of the relevant debit market, including at least 45% of all U.S. debit transactions and over 55% of card-not-present transactions. As a result, Visa's would-be competition is handicapped and unable to gain the scale necessary to compete on price and quality because a network must be carried by both sides of the transaction for the network to own the transaction. Visa's agreements with issuers, merchants, and acquirers prevent competitors from gaining scale and competing.

26. Third, Visa secured agreements from several large, would-be competitors to not release innovative or new technologies that could serve as alternatives to Visa's services. These agreements, including with Apple, PayPal, and Square, have turned potential competitors into partners to the detriment of consumers.

27. Visa enjoys supracompetitive profits that it would not be able to maintain but-for its anticompetitive and unlawful conduct. These high fees are one of the largest costs merchants face. To stay in business, merchants pass-on these fees to consumers, who bear the brunt of Visa's excessive fees and lack of competition.

28. Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, and various state laws to put a stop to Visa's unlawful and anticompetitive conduct and remedy the harm Visa has caused.

## JURISDICTION, VENUE, AND COMMERCE

29. This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of

interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of Visa.

30. The Court also has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a) because Plaintiff seeks injunctive relief under the Clayton Act, 15 U.S.C. § 26. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

31. This Court has personal jurisdiction over Visa because it purposefully directed its business activities towards this jurisdiction, had substantial contacts with this jurisdiction, and because Plaintiff's claims for relief arise from and relate to illegal acts committed within this jurisdiction.

32. Visa's activities were within the flow of and were intended to and did have a substantial effect on the interstate commerce of the United States. Visa's services are sold in the flow of interstate commerce.

33. By reason of the unlawful activities alleged herein, Visa's unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed Class Members. Visa, directly and through their agents, engaged in activities affecting all states.

34. Plaintiff seeks injunctive relief, compensatory damages, all damages available under applicable statutes, costs, and reasonable attorneys' fees.

35. Venue is proper in this Direct under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Visa transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce has been carried out in this district. Among other conduct, Visa provided network services for transactions conducted in this District and entered into agreements with merchants and/or acquiring banks in this District.

36. During the relevant period, Visa engaged in anticompetitive conduct in the United States that was purposefully directed at the United States and was specifically intended to impact the competition, prices, and overall debit networks that Plaintiff, Class Members, merchants, and acquiring banks use to complete transactions for goods and services.

37. Visa's illegal conduct was directed at and had the intended effect of causing injury to persons residing in the United States, including in this District. Accordingly, this Court has jurisdiction over this cause of action, and venue is proper.

## PARTIES

38. Plaintiff Lindy Griffith is a individual and citizen of Kansas City, Missouri. Plaintiff Griffith uses a debit card from Commerce Bank that has Visa designated as the font-of-card network. Plaintiff Griffith's primary method of paying for goods or services is with her Visa debit card, and she has consistently made purchases with this or a previously issued Visa debit card from Commerce Bank for personal, family, and/or household purposes for at least the last decade. On average, Plaintiff Griffith uses her Visa debit card to purchase thousands of dollars of goods and services for personal, family, and/or household purposes, per year.

39. Defendant Visa, Inc. is a Delaware company with its principal place of business in San Francisco, California. Visa owns and operates the Visa debit network, the largest debit network in the United States. Last year, Visa routed 57.6 billion debit transactions worth $2.8 trillion. Visa provides a two-sided transaction platform that processed debit transactions between merchants, consumers, and banks through authorization, clearance, and settlement. In fiscal year 2023, Visa reported approximately $32.7 billion in revenues, including $14 billion in the United States. Visa engages in interstate trade and commerce, and its activities substantially affect trade and commerce. Visa's services are marketed, distributed, and offered through the United States, including across state lines and in this District.

## FACTUAL BACKGROUND FOR CLAIMS

**I.    Debit Transactions**

    **A.    How Debit Card Payment Processing Works**

40. The mechanics of debit transactions are vital to Visa's anticompetitive conduct and its ability to retain dominance in the market. Debit transactions are a financial transaction whereby funds are drawn from a consumer's bank account and transferred to a merchant's bank account to pay for goods and services. Today, tens of millions of consumers prefer to use or rely on debit cards as their primary method of purchasing goods and services online and in-person.

41. General purpose debit cards, *i.e.,* debit cards that several unrelated merchants will accept, are the most common way debit transactions occur in the United States. Visa and other debit networks do not issue debit cards. Rather, the consumer's bank, the "issuing bank" or "issuer"[1] provides the consumer with a debit card. Visa enters agreements with issuing banks to create and issue debit cards that run on its network. Relatedly, merchants' banks, the "acquiring bank" or "acquirer"[2], enter into agreements with Visa so that merchants can and will accept the consumer's debit payment.

42. A debit transaction involves a transfer of funds from the consumer's bank account to the merchant's bank account. This process occurs over the debit network. The debit network includes a debit credential or other unique identifier to the consumers that can be accepted by all merchants who participate on the same network. The debit network also provides payment guarantees for merchants, a method to dispute and chargeback transactions for consumers, fraud protection for all parties, and a way for issuing banks and acquiring banks to communicate with one another (*i.e.,* the "rail").

43. Banks, not debit networks, transfer money from the consumer's account to the merchant's account. Debit networks, like Visa's, provide the mechanism to achieve these transactions. Debit networks also establish the rules for transactions occurring on the network. Visa, however, influences the rules for other debit networks by leveraging its market power and necessary role in completing the majority of all debit transactions.

44. Consumers can use their debit cards to make purchases in-person or online. Debit card credentials link the consumer's account to the card and act as a security feature. Debit card credentials include, for example, a 16-digit card number ("debit card number"), card verification value ("CVV"), expiration date, a pin number, and an EMV security chip. The card will also graphically identify the "front-of-card" network. Some debit cards also identify the "back-of-card"

---

[1] The issuing bank may work with an issuer processor to connect with the debit network. The processor may also provide services like managing card issuance, authorizing or declining transactions, and communicating with settlement entities. Here, "issuing bank" and "issuer" includes the issuer processor.

[2] Similar to issuers, acquiring banks may also work with acquiring processors to send transaction data to the network. Here, "acquiring bank" and "acquirer" includes the acquirer processor.

network. As a result of the Durbin Amendment, debit cards can have numerous networks enabled but must have at least one unaffiliated back-of-card network. Generally, however, most cards are limited to a single front-of-card network and one or two back-of-card networks, one of which is unaffiliated with the front-of-card. Figure 1 shows the debit card credentials and networks.

**Figure 1:**



46. A debit transaction in its simplest form involves six steps: (1) the consumer purchases goods or services from a merchant, and presents their debit card for payment; (2) the merchant captures the consumer's account information via debit credentials and sends it to the acquiring bank; (3) the acquiring bank asks the debit network for an authorization from the issuing bank; (4) the debit network submits the transaction to the issuing bank for authorization; (5) the issuing bank authorizes the transaction and sends the response to the merchant; and (6) the issuing bank transfers the money, minus a fee ("interchange fee") from the consumer's bank account to the acquiring bank to be deposited into the merchant's bank account.

46. Debit transactions are processed in a matter of seconds. Generally, consumers are unaware of how, or even that, their money is allocated among merchants, debit networks, processors, and the financial institutions.

47. A debit network, like the one operated by Visa, is simply the middleman between the issuing bank and acquiring bank who provides the means of communication. Visa collects a myriad of fees throughout the process from tens of billions of debit transactions that occur annually.

48. Figures 2 and 3 below provide a graphical representation of the transaction:

**Figure 2[3]**



[3]       https://community.developer.visa.com/t5/Tutorials/A-Detailed-Look-at-the-Payments-Ecosystem-from-Visa-Payment/ba-p/7463.

11

CLASS ACTION COMPLAINT

**Figure 3[4]**



49. Today, card-not-present transactions make up approximately half of all debit transactions, with the number dramatically increasing since 2010. For card-not-present transactions, the consumer manually enters their debit credentials or relies on debit credentials that have been saved in a digital wallet, such as Google Pay, Apple Pay, or PayPal. Card-not-present transactions rarely, if ever, prompt the consumer to enter their PIN number, and instead rely on other security features, such as multi-factor authentication.

**B.    Debit Networks**

50. Debit cards must have at least two debit networks: one front-of-card network and at least one back-of-card network unaffiliated with the front-of-card network. Issuing banks select the front-of-card network and choose which and how many the back-of-card networks to enable. The front-of-card network's logo is often displayed on the card; back-of-card networks often are not included.

51. Consumers rarely have a choice for debit networks used. Rather, the choice is dictated by where the consumer decides to open a checking account. Visa is the dominant front-of-card network, Mastercard is a distant second, and two much smaller networks account for the

---

[4]        https://www.mastercard.com.au/en-au/business/merchants/start-accepting/payment-process.html.

remainder. Thus, regardless of where the consumer decides to bank, his front-of-card debit network will most likely be Visa.

52. Visa debit cards (i.e., debit cards including Visa as the front-of-card network) typically include Interlink as a back-of-card network. Interlink is a Visa affiliated back-of-card network. Thus, most Visa debit cards include a total of three debit networks: Visa as the front-of-card network, Interlink as a back-of-card network, and one more Visa unaffiliated back-of-card network. These unaffiliated back-of-card networks are generally smaller, PIN networks. PIN networks are aptly named after their origin from ATM machines, which required entering a PIN number to withdraw cash.

53. Issuing banks determine the back-of-card networks enabled to process certain transactions. Despite being included on most debit cards, PIN networks process a minimal amount of debit transactions, largely because of Visa's unlawful and anticompetitive conduct.

54. Visa has secured long-term contracts with most issuing banks. Plus, changing front-of-card networks is very expensive, including because it requires re-issuing new debit cards to all debit card holders. Thus, Visa faces little competition from other debit networks for the banks it already has a relationship with.

**C.    Debit Network Fees**

55. Consumers do not pay debit networks like Visa directly to use their services. Rather, debit networks charge fees on both issuing banks and acquiring banks for every debit transaction.

56. Acquiring banks pay two types of fees: per-transaction fees and fixed fees. The acquiring bank pays Visa a "network" fee on every transaction processed through Visa's network. Network fees vary depending on the type of transaction, including whether the consumer pays in-person or online. Since 2012, Visa also charges acquiring banks a fixed monthly fee, or the "Fixed Acquirer Network Fee" ("FANF"). The FANF can also vary depending on the size and number of transactions the merchant processes. The acquiring bank also pays a per-transaction fee to the issuing bank for its services, known as the "Interchange Fee." For issuing banks with $10 billion or more in assets, the Federal Reserve caps the Interchange Fee. For smaller issuing banks, the

1   debit network decides the Interchange Fee. PIN network fees are generally lower than the fees

2   imposed by Visa.

3       57. The merchant is generally on the hook for at least some of these fees, and also pays an

4   additional fee to the acquiring bank for its services. These fees, across hundreds, thousands, or

5   millions of transactions, add up to a significant cost for merchants. To offset these costs, merchants

6   increase their prices for goods and services. Accordingly, the consumer pays for these services

7   through increased prices for goods and services to cover the cost of fees imposed on the merchant.

8   Thus, the consumer is ultimately the party burdened with the costs of processing the debit

9   transaction.

10      **D.    How Visa Came to Dominate the Debit Network Market**

11      58. The late 1960s marked the beginning of modern ATM and point of sale ("POS") systems,

12  which were effectively cash-dispensing machines that allowed consumers to enter a 4-digit pin

13  number and withdraw money from their checking account. Visa, then referred to as

14  BankAmericard, was a joint venture owned and controlled by Bank of America that was already

15  involved in the credit card industry. In the 1970s, the name was changed to Visa and the first Visa

16  debit cards were introduced. Around this time, POS systems began to see more wide-spread

17  integration into merchants, which provided a faster way to transfer money than writing checks.

18      59. Visa quickly scaled its debit business using its credit card relationships, infrastructure, and

19  standing in the industry. Visa's network rules required merchants to accept its credit and debit

20  cards. Further, and until the early 2000s, Visa had exclusive relationships with its issuing banks.[5]

21  Thus, those issuers were not permitted to issue Visa's competitors' cards, like American Express

22  or Discover.

23      60. In the 1990s, Visa began offering a debit card that let consumers access their checking

24  account on the same network that processed Visa's credit cards. This network required a signature

25  instead of a PIN. At this point, merchants were not charged fees for accepting debit payments; fees

26

27  [5] A 2003 opinion from the United States Court of Appeals for the Second Circuit put an end to this
    practice, holding that the exclusivity relationships were anticompetitive and illegal. Settlements
    stemming from this decision included an agreement to allow merchants to accept its debit cards
28  without accepting credit cards, and vice versa.

became mainstream, however, coinciding with the introduction of Visa's debit card processed over its credit networks. While Visa's competitors promoted PIN networks, which included minimal fees, Visa pushed its signature network that was then charging about $1.35 on a $100 purchase. Despite charging higher fees, Visa used this to gain market dominance. While higher fees meant higher prices for the ultimate consumer, higher fees also meant higher profits for Visa, which turned over a portion of the profits to banks in exchange for issuing its debit cards.

61. Despite Visa now allowing merchants to accept Visa debit cards without accepting their credit cards, and vice versa, Visa was already a dominant force in the market. Between 2006 and 2008, Visa and the second largest debit network provider, Mastercard, separated from their former banks and went public. While issuing banks technically had an option to issue both Visa and Mastercard branded cards, most chose to only issue one. Since this pre-dated the Durbin Amendment, featuring only one debit network per card was the common practice. Visa and Mastercard fought for front-of-card placement; however, the significant costs of swapping meant very few banks swapped and other debit networks had little ability to compete. Thus, merchants had to use the network provided on their card, the majority of which were Visa or Mastercard.

62. The Durbin Amendment ended this practice in 2012, requiring issuers to enable at least one unaffiliated back-of-card network on their debit cards. The Durbin Amendment also capped the interchange fees that merchants and acquiring banks pay issuing banks with more than $10 billion in assets. Interchange fees for smaller issuing banks (i.e., with less than $10 billion in assets) are set by the debit network (e.g., Visa).

63. Today, Visa remains the largest debit network, operating as the front-of-card network for over 70% of debit card transactions in the United States. Mastercard is a distant second at 25%.

**E.     Visa Faces No Meaningful Competition from PIN Networks**

64. As mentioned previously, debit networks must have scale on both the issuing and acquiring side to gain scale and meaningfully compete. That is, an issuing bank is unlikely to enable a network that is not already accepted by many acquiring banks and merchants, and an acquiring bank or merchant is unlikely to accept a debit network that is not already enabled by many issuing banks. This feedback loop is known as "network effects."

65. A debit network will not be used for a transaction unless each party (i.e., issuing bank, acquiring bank, and merchant) has enabled it to process the transaction. Thus, even if a debit network is on a consumer's debit card, that debit network might not receive transactions.

66. Network effects are a non-issue for Visa, who gained massive scale early on as a result of its signature network and prior industry connections as a credit card network affiliated with Bank of America. Visa's stronghold on the industry and long-term agreements with issuing banks makes entering the market nearly impossible for smaller, rival PIN debit networks.

67. Nevertheless, network innovations have provided Visa's would-be competitors opportunities to compete. Indeed, PIN networks are now able to offer PIN-less transactions, which allow PIN networks to process card-not-present transactions and in-person transactions without requiring the consumer to enter a pin.

68. To stifle the competitive impact of these innovations, Visa imposes rules and terms on merchants and acquirers that require them to route a majority of their transactions to Visa instead of an unaffiliated back-of-card network. Visa's practices subdue the amount of competition. In particular, smaller networks, such as PIN Networks, can only compete for a fraction of debit transaction, thereby insulating Visa from facing any meaningful competition and artificially limiting routing options.

69. Visa's power to enforce its rules and terms stems from its dominance in the market and the fact that certain transactions must always be routed through Visa because back-of-card networks cannot process them. Certain transactions, such as transactions over a specified dollar limit or that require certain encryption criteria, cannot be processed over back-of-card networks. These transactions are known as "non-contestable" transactions. For example, card-present transactions can be non-contestable when the issuing bank does not allow the network to process card-present PIN-less transactions and the consumer does not enter a PIN, either because the merchant did not prompt the consumer to enter a PIN or because the consumer opted to not enter a PIN. Card-not-

1    present transactions can be non-contestable if they are not tokenized.[6] In 2023, only a tiny fraction

2    of card-not-present tokenized transactions were processed over an unaffiliated debit network.

3    70. Non-contestable transactions make up the majority of Visa debit card transactions, largely

4    because of network effects. Historically, issuing banks generally did not enable card-not-present

5    PIN-less transactions—sometimes at Visa's request—which resultantly deterred merchants and

6    acquiring banks from enabling card-not-present PIN-less transactions.

7    71. Visa's prominence forces merchants to accept Visa along with its terms and conditions, or

8    otherwise lose out on a substantial amount of business. Thus, nearly all merchants route the non-

9    contestable transactions to Visa instead of alternative, often more affordable, back-of-card

10   networks.

11   **F.      Alternative Debit Networks**

12   72. Debit card alternatives exist for consumers. These include alternative debit network rails

13   (i.e., networks) developed by fintech firms (hereafter, "fintech debit").

14   73. Fintech debit can process transactions between consumers and merchants with end-to-end

15   functionality similar to debit networks, including authorizing payment from the issuing bank,

16   facilitating communications with the issuing bank to authorization and clear the transaction, and

17   providing settlement services by initiating a payment to the acquiring bank. Further, alternative

18   debit networks, including fintech debit, can complete the final transfer of funds with money

19   transfer services available to banks, such as the Automated Clearing House ("ACH") or Real Time

20   Payment ("RTP") networks, which are more affordable than Visa's debit network prices.

21   74. Visa knows and is concerned that it may lose its dominant position in the market to these

22   alternative debit networks, which have the capacity to provide equivalent functionality to Visa's

23   debit network at a lower cost, including a credential to be used at merchants, payment guarantees,

24   the ability to dispute charges, chargeback capabilities, and fraud protection.

25

26

27   _____

28   [6] Tokenization is the process of replacing the debit credentials, generally the 16-digit number on the debit card, with a unique alternate card number (i.e., a "token"). Visa-branded debit card transactions initiated online or through a mobile app or digital wallet will generally be tokenized.

**II.    Visa Engages in Exclusionary, Anticompetitive, and Unlawful Conduct to Dominate Debit Transactions in the United States at the Expense of Consumers**

**A.    Visa Has Been the Dominant Debit Network Provider for Over a Decade**

75. Despite supracompetitive prices, stabilizing prices, and depressing price competition, Visa still processed over 60% of all debit transactions and 65% of all card-not-present debit transactions in the United States. Visa's closest competitor, Mastercard, pales in comparison. Indeed, Visa is the front-of-card network for over 70% of debit card payments, nearly three times as much as Mastercard's 25%. The next biggest "competitor(s)" hold single digit market shares.

76. Visa maintains its dominance and monopoly power over the market by preventing its competitors from gaining the scale needed to meaningfully compete, and preventing would-be competitors from entering the market by entering into agreements for them not to innovate or compete.

77. First, Visa prevents its competitors from gaining the scale necessary to meaningfully compete. For example, Visa will enter into *de facto* exclusive deals that require merchants and/or their acquiring banks to route available transactions through Visa. Visa simultaneously pays issuing banks to take action that limit merchants and acquiring banks' ability to route payments to alternative networks, such as PIN networks, by getting them to agree not to enable certain networks or types of transactions. If an issuing bank, acquiring bank, or merchant refuses these deals, Visa will punish them with heightened fees. These deals ensure more transactions are non-contestable, thereby retaining its dominance and leverage over the market and preventing transactions from being diverted to other, more affordable, networks.

78. Second, Visa pays off potential competitors to prevent them from introducing or creating innovations that would compete with Visa's debit network. Like the banks and merchants above, if the would-be competitors refuse, Visa punishes them with increased fees. At bottom, Visa controls the market by forcing favorable deals under threat of punishment on banks, merchants, and would-be competitors.

**B.    Visa Enters Contracts with Banks and Merchants to Hinder Competition**

79. Visa's control of the debit network market is not an accident. Visa intentionally and strategically locked up the debit network business by forcing issuing banks, acquiring banks, and merchants into exclusivity deals that prevent competition.

80. After the Durbin Amendment, which required at least one unaffiliated back-of-card network in an attempt to foster competition, Visa took intentional steps to thwart the threat to its position, including leveraging its power over merchants and banks to enter into routing agreements and volume commitments.

81. For a significant portion of card-present and card-not-present transactions, the front-of-card network must be used. For 70% of debit card volume generally, Visa is the front-of-card network. Further, and even after the Durbin Amendment, approximately 45% of card-present transactions where Visa is the front-of-card network were non-contestable. This number is even higher for card-not-present transactions on Visa cards. Accordingly, the majority of debit card transactions must be run on Visa's network.

82. Visa has significant leverage over issuing banks, acquiring banks, and merchants because the majority of debit transactions must be run on its network. This leverage gives Visa the power to impose volume commitments, which obligate merchants and acquirers to process a significant majority of their transactions over Visa's debit network.  If a bank or merchant fails to meet this volume commitment, they are subject to heightened fees. Visa uses two methods to obtain these volume commitments. First, Visa gives issuing banks, acquiring banks, and even some merchants a kickback for their exclusivity. Second, unless merchants and acquiring banks agree to these volume commitments and/or volume commitments, Visa penalizes them with increases rack rates (i.e., list prices), which are separate from the incremental costs for network and interchange fees.

**1.    Visa Imposes Anticompetitive Contracts on Merchants and Acquiring Banks**

83. Under threat of penalties and fees, Visa imposes volume commitments that require merchants and acquiring banks to route a most of their transactions over Visa's debit network. In other words, merchants and acquiring banks will face severe penalties on transactions they must

process over Visa's debit network if they attempt to route even a tiny fraction of their contestable transactions over more affordable networks.

84. Visa has routing agreements with many large merchants and acquiring banks that control the routing decisions for merchants that do not have a direct agreement with Visa. These contracts ensure Visa remains the primary debit network for debit transactions. In effect, Visa buys their loyalty, while simultaneously subjecting merchants and acquirers to substantially increased fees if they route too many transactions through more affordable debit networks.

85. For example, Visa structures contracts with merchants as a bid for the top position on the routing table, which is a ranked list that determines the network a transaction will be routed through if available. If Visa does not get the top position, or at least a very high position, Visa threatens the merchant with high rack rates on all transactions routed to Visa. This is effectively a cliff pricing structure. Cliff pricing, also known as "all unit" pricing, grants the merchant or acquiring bank a lower price for every transaction routed to Visa so long as its total volume satisfies the committed threshold. If the merchant fails to meet the threshold, all transactions are subject to higher penalties.

86. Numerous merchants, transacting hundreds of billions of dollars, have signed agreements with Visa to route 100% of their eligible transactions through Visa's debit network. In 2023, Visa paid a merchant over $20 million for exclusivity. While pricing terms may vary, Visa essentially offers the carrot or the stick.

87. Indeed, many routing contracts include a provision allowing Visa to terminate the entire contract early and claw back prior incentives if the merchant or acquiring bank fails to meet its volume commitment.

88. As explained previously, Visa is able to impose these agreements on merchants and acquiring banks because of the significant number of non-contestable transactions that must be processed over Visa's network. Merchants thus have two choices: (1) accept Visa's terms; or (2) pay supracompetitive fees (i.e., rack rates) for non-contestable transactions that must run through Visa.

89. Poignantly, and because of the number of transactions that must be processed through Visa's debit network, paying the supracompetitive rack rates offsets any potential savings a merchant might obtain from running transactions through more affordable debit networks. Indeed, to technically compete, many debit networks would have to offer their services completely free for it to make sense for a merchant to pay the supracompetitive prices associated with not accepting Visa's terms.

90. Moreover, some acquirer processors that operate would-be competitor PIN networks have entered into exclusive routing agreements with Visa. To entice these agreements, Visa offers monetary incentives in exchange for volume commitments. These payments also disincentivize the would-be competitor from even trying to compete for additional transactions.

91. As a result, PIN networks or other competitors can only meaningfully compete with Visa if they (1) offer a cheaper price than Visa, and (2) offset the penalties imposed on merchants and/or acquiring banks for not entering into volume commitments with Visa. In most cases, however, the services must be free, or even include the debit network paying the merchant, for it to offset the severe penalties Visa will impose.

92. These barriers to entry mean Visa faces minimal competition and can impose supracompetitive fees without recourse. In fact, if Visa lowered its fees, it would lose its leverage over the debit network market.

93. To add fuel to the fire, Visa will also price its other products, such as credit transactions, off a merchant's debit volume. For example, to secure a significant volume of business from Google and thwart any competition over the transaction, Visa offered Google credit incentives. Visa used similar credit incentives with a health food supermarket chain. Accordingly, even large merchants with more negotiating power are prevented from refusing Visa's anticompetitive deals because doing so will mean higher fees on non-contestable debit and credit transactions processed on Visa's network. Notably, many alternative networks, like PIN networks, have no credit businesses thereby further limiting their ability to compete.

94. Visa has also introduced additional fees, which it will waive in exchange for volume commitments, to further pressure merchants and acquirers into accepting volume commitments.

These include FANF, a fixed monthly fee imposed on merchants facilitated through acquiring banks that is charged on top of the per-transaction fees. Since the Durbin Amendment in 2010, Visa has increased the FANF twice.

95. Visa, through these contracts and practices, artificially increases the cost merchants will incur on Visa transactions if they route transactions to non-Visa debit networks. At bottom, Visa does not compete for business, and instead uses various mechanisms and threats to prevent competition, retain its market dominance, and impose supracompetitive fees without the fear of recourse or competition.

**2.      Visa Leverages Anticompetitive Contracts on Issuing Banks**

96. The Durbin Amendment requires at least one unaffiliated back-of-card network to be enabled, but does not place a ceiling on the number of additional networks enabled. Rather, issuing banks could enable a number of additional networks, thereby giving merchants additional choices and increasing competition. Visa prevents such a result by leveraging its monopoly power over issuing banks.

97. For example, Visa's contract with JPMorgan Chase explicitly requires that 90% of Chase-issued Visa debit cards only enable one unaffiliated back-of-card network. Similarly, in 2023, Visa contracted with one of its largest debit-issuing fintech debit customers to require that only one unaffiliated network be enabled on all debit cards issued from the issuing banks. Visa's issuer contracts regularly contain standardized volume requirement provisions, which require the issuing bank to maintain its annual growth of Visa debit transactions in proportion with Visa's overall debit growth in the United States. These provisions guarantee that Visa does not lose its market share dominance over debit transactions.

98. Visa enforces these contracts with threats of severe penalties, including cliff pricing, similar to its contracts with merchants and acquirers. For example, if an issuer fails to maintain proportional growth in accordance with the standardized volume requirement provisions, it can be required to pay an early termination fee equal to a percentage of the benefits it has earned plus a multimillion-dollar fixed fee. Further, failure to abide by Visa's volume commitments gives Visa the right to impose penalties across all Visa debit transactions.

99. These contracts incentivize issuing banks to limit the number of additional networks enabled on debit cards. Indeed, a 2020 contract between Visa and an issuing bank was specifically designed to prevent competition from PIN-less networks or Real Time Payment by forcing the issuer to dump the networks if too much volume was being diverted away from Visa.

100. Visa also uses incremental debit incentive deals to prevent large issuers from enabling PIN-less networks for face-to-face transactions. Smaller issuers rely on their issuer processors to make network selections, so Visa imposes agreements designed to discourage PIN-less networks from being enabled.

101. Visa's contracts with issuers protect its non-contestable transactions and reinforce the protections created by its contracts with merchants and acquiring banks. Because only enabled networks can be used to complete a transaction, Visa is able to maintain its dominance (processing over 70% of all debit transactions) by preventing issuers (and merchants or acquirers) from enabling additional networks. Indeed, less enabled networks means additional volume, and specifically non-contestable volume, for Visa. This loop ensures Visa maintains and increases its leverage and market dominance.

102. Like the tactics used to secure merchant routing volume, Visa will also leverage discounts on its other products, like its Debit Processing Servicers, to win additional issuer routing volume. Visa packages card-branded issuance contracts with its DPS processing services to win business from large banks.

### 3.     Visa Successfully Undermined the Purpose of the Durbin Amendment and Maintained its Monopoly Power

103. The Durbin Amendment was intended to boost competition in the debit network space; thereby reducing the monopoly power of Visa. The Durbin Amendment initially made a small impact and reduced Visa's market share; however, the success of the amendment was short lived, and Visa has actually increased its market share in the 14 years since the Durbin Amendment was passed. Indeed, Visa itself recognizes that it continues to dominate the market despite other networks offering better prices.

104. After the Durbin Amendment was passed in 2010, many debit networks attempted to challenge Visa's monopoly position. Visa fought back these attempts by leveraging its monopoly power and volume of non-contestable transactions against issuers, merchants, and acquirers, threatening them with punishment if they entertained an alternative debit network. This forced loyalty has hindered competition at the expense of consumers.

105. Visa also undertook a relentless campaign of locking up entities that control routing decisions and by entering into exclusivity agreements. Today, Visa has exclusive routing agreements with over 180 of its largest merchants and acquirers. These contracts cover over 75% of Visa's debit volume, effectively 45% of all debit volume in the United States. These contracts foreclose meaningful competition because of the network effects; issuers, merchants, and acquirers are unlikely to enable or accept additional networks because they do not have the requisite scale.

106. Visa deployed similar strategies in response to Regulation II, the Federal Reserve's October 2022 rules clarifying the provisions of the Durbin Amendment. Ahead of Regulation II, Visa endeavored to obtain additional volume commitments and exclusivity deals, obtain more impactful early termination fees and penalties, and renew its agreements. In other words, Visa locked up as much volume as possible to reduce the impact of Regulation II and stifle any potential competition.

### 4.    Visa Forecloses Competition by Creating Artificial Barriers to Entry

107. Visa is already well established and in control of both sides (i.e., consumers and issuing banks on one side, and merchants and acquiring banks on the other). Locking up both sides with anticompetitive contracts prevents additional competitors from gaining scale: an already difficult task because of network effects. This ensures Visa faces no real competition for market share.

108. On the issuing side, Visa incentivizes banks to provide the least amount of non-Visa networks and routing options. With fewer non-Visa networks available, merchants and acquiring banks are less likely to accept non-Visa networks, because doing so would be more expensive and less beneficial. Accordingly, new networks cannot obtain the scale needed to compete.

109. Even if smaller networks, such as PIN networks, wanted to compete, they would have to provide services at a sufficiently below market price to compensate for the penalties and

24

1  punishment the merchants, acquirers, and issuers would inevitably face from Visa. Such prices are

2  untenable, and would often require negative prices (i.e., the network paying the banks or merchants

3  to accept their services.).

4      110. Accordingly, competing with Visa is a herculean, if not impossible, task for smaller

5  networks. This is true despite PIN networks generally offering lower prices and innovative

6  technologies and services that would, in a free and competitive environment, compete with Visa.

7      111. As a result, 14 years after the Durbin Amendment, PIN networks collectively process

8  only 11% of all debit transactions in the United States, and only 5% of card-not-present

9  transactions. Not a single PIN network has more than single-digit market share. Indeed, Visa's

10  anticompetitive conduct has made any attempt at competition futile.

11      112. Smaller networks are further disadvantaged because they cannot offer comparable fraud

12  protections, which require a critical mass of transaction data to reliably detect and/or prevent. This

13  further solidifies Visa's dominance. To be sure, Visa itself recognizes that it continues to win

14  market share despite not offering the lowest prices.

15      113. The impact of this is two-fold. Not only is Visa insulated from competition, but the lack

16  of competition means Visa can obtain more non-contestable transactions; thereby further

17  increasing its leverage and preventing competition. For example, in 2023, less than half of total

18  United States debit volume was processed as card-present PIN-less transactions. As a result, many

19  merchants didn't enable these transactions. However, Visa feared that widespread enablement was

20  imminent if a large issuer enabled PIN-less transactions. Visa took affirmative steps to foreclose

21  such a result

22      114. JPMorgan Chase, which issues Visa-branded debit card with Mastercard's Maestro as its

23  back of card network, requested relief from its contract with Visa to add Discover's Pulse network

24  as a back-of-card network to comply with Regulation II. Pulse, unlike Maestro, offered card-

25  present and card-not-present PIN-less transactions. Visa granted Chase a short-term waiver, but

26  required Chase to sign a new routing agreement.

27

28

**C.  Visa Leverages its Monopoly Power to Foreclose Innovative Alternative Networks**

115. Fintech debit networks allow consumers to purchase goods and services on debit using their bank account number, rather than their debit card. Fintech networks often do not require traditional debit networks, like Visa, to process the transaction. These Fintech networks can take different forms, including for example the digital wallet, a software-based product that stores the consumer's debit information. Apple Pay, Paypal, and Google Pay are well-known examples of digital wallets. Fintech networks have already seen success in other parts of the world. Figure 3 below demonstrates how these Fintech networks operate and can replace Visa.

116. Recognizing the threat Fintech networks have on its business, Visa has taken affirmative steps to squash their potential in the United States and thereby retain its market dominance and power.

**Figure 3**



117.  Rather than rely solely on its traditional means of foreclosing competition, Visa took a new approach with Fintech networks and viewed them as potential acquisitions—rather than compete or foreclose competition, Visa buys any competition from Fintech networks.

118. As a result, and despite the increasing popularity of online debit transactions and debit network alternatives that have seen success around the world, Visa's debit network continues to be the primary debit network used in the United States, including by the new Fintech networks.

119. Fintech networks' failure to gain a footing in the United States market is not the result of competition, and instead Visa's leveraging of market power. Anytime new or innovative technologies emerge, Visa buys the competition rather than competing.

120. For example, Visa will share its monopoly profits in exchange for protections against disintermediation. For Visa's largest and powerful merchants, Visa exchanges its monopoly profits in exchange for disintermediation and non-discrimination protections, non-disparagement, and future commitments. By Visa's own admission, these contracts are unrelated to routing and are often uneconomical.

   1.    **Fintech Networks Threaten to Disintermediate Visa's Debit Network**

121. Fintech networks can effectively provide every service Visa's networks provide, including authorizing payments, clearing and settling transactions, providing payment guarantees, protecting against fraud, and offering chargeback services. Accordingly, Fintech networks are viable alternatives to Visa's business, and recent innovations only exacerbate this threat.

122. Indeed, alternative payment rails that provide real-time money transfers are becoming increasingly available, and fintech networks have built on the rails such that they are now viable, would-be, competitors of Visa. Specifically, Fintech networks are a threat to Visa's lucrative dominance of card-not-present transactions because they can offer direct mobile transfers.

123. These Fintech networks can be integrated and used by banks, payment processors, and other firms who can build connections between issuing banks and merchants. Visa is resultantly concerned these Fintech networks will become a viable debit substitute and will develop into a widespread alternative that permits consumers to transfer funds direct from their bank account and thereby entirely displace Visa's debit network services.

124. Bank transfers via Automated Clearing House ("ACH") have been in use for decades. These services typically take several days to process, and even longer for the funds to become available for consumers to spend. However, recent innovations building on ACH have developed a more efficient payment transfer known as Real Time Payments ("RTP"). For example, The Clearing House launched RTP network, a payment network that allows for immediate clearance and settlement of transactions. Similarly, the Federal Reserve recently, in 2023, launched FedNow,

1   which provides instant payment services between depository institutions. While few digital wallets

2   have incorporated RTP or similar networks, as these technologies continue to improve, and more

3   banks begin to integrate them, the opportunity for more efficient payment networks than Visa's

4   traditional debit network becomes a reality.

5      125. Digital wallets come in two primary forms: staged wallets (also called "stored value

6   wallets") and pass-through wallets. Staged wallets allow consumers to make purchases from funds

7   stored in the wallet. Consumers can preload their staged wallet with funds, or transfer funds into

8   the wallet through a linked bank account. PayPal and CashApp are well-known examples of staged

9   wallets. Pass-through wallets, on the other hand, transmit the consumer's payment information

10  directly to the merchant's acquiring bank. The acquiring bank then processes the transaction

11  similar to a traditional debit card transaction. Apple Pay and Google Pay are well-known examples

12  of pass-through wallets.

13     126. Like debit networks, digital wallets require scale on both sides of the market to be

14  successful. However, digital wallets can achieve this scale, and thus pose a particular threat to

15  Visa.

16     127. Visa is well aware of the risk digital wallets pose to its business. Indeed, Visa knew Apple

17  had engaged in discussions with a large issuing bank about creating a new debit network without

18  Visa or Mastercard.

19  **2.    Visa Leveraged its Monopoly Power to Prevent Disintermediation with Staged**

20  **Digital Wallets**

21     128. A Visa executive identified PayPal as the only major entity to successfully

22  disintermediate Visa in the United States. This success was short lived, however, as Visa imposed

23  a massive deal with PayPal in 2016 with its routine carrot or stick offer: threatening high fees or a

24  share of the monopoly profits if PayPal diverted its transaction volume back to Visa's network.

25     129. In the 2000's and into the early 2010's, PayPal began to see success as a form of online

26  payment. In fact, Visa initially welcomed PayPal's success because PayPal customers were using

27  Visa debit cards to pay for their online transactions.

28

CLASS ACTION COMPLAINT

130. Visa's outlook on PayPal turned in 2015, however, after PayPal split from its former owner eBay and began encouraging consumers to pay through their bank accounts rather than with debit or credit cards.

131. PayPal is a staged wallet, and thus consumers preload or transfer funds into their wallets from a linked account. Transactions are then processed using ACH, which offers many of the same benefits of debit networks. These transactions thus threatened Visa's market dominance because they could be processed without Visa as a middleman.

132. While PayPal was encouraging more staged wallet use, many consumers still used their debit cards to process transactions. Visa accordingly threatened to penalize PayPal with high transaction fees unless PayPal agreed to an expansive routing contract. PayPal was ultimately forced to agree, or otherwise absorb the increased fees and potentially lose a vast number of customers who were using Visa branded cards.

133. Visa simultaneously thwarted PayPal's attempts to partner with brick-and-mortar merchants by restricting ACH transactions for all consumers who had Visa-branded cards in their PayPal wallets.

134. While Visa reeled back these restrictions in 2021, it continued to require information sharing, which it uses to monitor PayPal's product performance. Further, Visa restricts consumers' ability to use PayPal's in-store ACH option by requiring them to first scan a merchant's QR code and then connect to PayPal to approve the transaction. These additional steps deter consumers from utilizing PayPal as an in-store Visa alternative.

135. PayPal, like many others, is forced to accept Visa's ongoing demands. Indeed, PayPal entered a new 10-year contract with Visa in 2022 that requires PayPal to route 100% of its Visa-eligible volume to Visa from years four to ten, and includes penalties for failing to convert its co-branded debit cards to Visa, requirements to participate in Visa's programs and services, and preservation of most of Visa's "customer choice" provisions, which give Visa preference over other competitors.

136. Since at least 2016, Visa has used the carrot and stick proposal—threatening exorbitant staged wallet fees—to coerce other entities into signing deals. Visa views these fees as, essentially,

a loyalty fee. If the entity behaves, Visa waives the fee. If the entity gets out of line (i.e., potentially disintermediate Visa), Visa imposes substantial fees that make business less profitable.

137. Visa has also entered several contracts with Square that prevent Square from meaningfully competing with Visa, including preventing Square from innovating alternative networks that would threaten Visa's dominance.

138. For example, in 2013, Square launched Square Cash (now known as Cash App) that allows for person-to-person payments. Square wished to avoid additional Visa fees so that it could facilitate these payments with debit cards, but Visa was concerned Square was going to build an ACH option that would threaten Visa's debit volume. To squash this threat, Visa offered to waive its high rack rates in exchange for the right to terminate should Square get out of line (i.e., compete and threaten Visa's dominance). In effect, the contract gave Visa a debit routing commitment and protection from ACH's threat of disintermediation.

139. In 2016, after Square innovated and announced its new product "Cash Drawer," which allowed users to store funds in their Square Cash account, Visa acted quickly to nullify the threat. Specifically, Visa threatened to terminate its agreement with Square, claiming the new product was antithetical to their collective goals. Faced with the threat of substantial fees and penalties, Square rescinded its product and removed the feature. In exchange, Visa did not terminate its contract.

140. In 2021, Square launched Cash App Pay, which allows consumers to purchase directly from merchants with Cash App. Square requested Visa waive the staged wallet fees, but Visa saw the threat Cash App Pay posed towards its business. Following suit, Visa leveraged high fees to nullify the threat, and in 2023 Square agreed to send 97% of Cash App Pay transactions over Visa's network. The agreement also required Cash App Pay to prefer Visa in the signup process and not encourage ACH.

### 3. Visa Pays-Off Potential Competitors with Monopoly Profits to Prevent Competition

141. Visa's dominance allows it to prevent competition from other potential competitors who do not operate staged wallets. Many potential customers, such as Google and Apple, are Visa

1    customers. Accordingly, Visa can use its typical playbook of high rack rates, fees, and penalties to

2    protect its market power. Visa is also willing to share its monopoly profits to prevent competition

3    and continuously reap its supracompetitive profits.

4    142. For the most powerful players, Visa creates custom packages that exchange incentive

5    arrangements on Visa-eligible debit transactions non-disintermediation and agreements not to

6    compete. These are effectively horizontal product market divisions. In fact, Visa knows that these

7    arrangements are often not focused on routing, such as with Amazon and Apple. And these

8    agreements sometimes result in Visa making less than it would in the worst-case scenario;

9    however, Visa is happy to enter them because they protect Visa's ability to continuously reap

10   supracompetitive profits. As a result, Visa retains dominance of Big Tech companies', such as

11   Google and Apple, debit acceptance and online transactions.

12   143. Visa's deals with Apple are a prime example. Apple has agreed to neither innovate nor

13   launch any payment product with the intent of competing with Visa. This includes developing a

14   functionality that utilizes non-Visa processes or products. The agreement also provides that Apple

15   will not incentivize the use of non-Visa cards or disintermediate Visa. In exchange, Visa shares its

16   monopoly profits with Apple: in 2023 alone, Visa paid Apple hundreds of millions of dollars. Visa

17   also reduces Apple's merchant fees in exchange for Apple's promise to not steer customers to

18   alternative payment methods like ACH or introduce other alternatives that will disintermediate

19   Visa. This arrangement ensures Visa's retention of Apple's debit volume and keeps Apple as a

20   non-competitor.

21   144. In 2022, Visa became concerned its relationship was going to reach a tipping point as

22   Apple was creating new inroads into the traditional debit network market. Due to Apple's, and

23   specifically Apple Pay's, existential threat to Visa's dominance, Visa opted to align its strategies

24   with Apple and offer massive payments and financial incentives to ensure Apple does not become

25   a true competitor.

26

27

28

### III.    Anticompetitive Effects

145. Visa has maintained its monopoly and market dominance through years of anticompetitive and unlawful behavior, including imposing exclusionary and anticompetitive contracts on issuers, acquirers, merchants, would-be competitors, and other industry participants by leveraging its non-contestable transactions, high rack rates, penalties, and fees. Visa's conduct prevents competition for transactions that would otherwise be contested and stymies competition for non-contestable transactions before it can arise.

146. But for Visa's conduct, PIN networks, Fintech networks, and other entities would have the opportunity to gain the necessary scale to meaningfully compete for transactions on the merits. This would mean more choices, superior features, and better prices. Visa's conduct, however, has stifled competition from current and would-be competitors, thereby causing higher fees and inferior services.

147. Visa's stranglehold on both sides of the market forecloses would-be competitors from achieving the scale necessary to compete. The lack of competition resulting from Visa's conduct prevents all market participants from realizing the benefits of competition.

148. Visa's stranglehold further entrenches its monopoly power, creating more non-contestable transactions and thereby increasing Visa's dominance and leverage. Visa's volume commitments restrict competitors from attaining the necessary scale. Without the necessary scale, potential competitors are unable to compete on price or quality. Further, Visa's commitments severely punish disloyalty, which effectively prevents merchants from ever being able to use another network service. Indeed, rival networks receive less volume if they reduce prices or develop new features or services. As a result, competitors and/or potential competitors are artificially capped by Visa, thereby protecting Visa's power and solidifying otherwise contestable transactions as its own.

149. Visa's leverage also punishes innovation, restricting the volume that rival networks receive or outright punishing them if they attempt to develop networks or network alternatives that could threaten Visa's dominance. As a result, innovation that would have otherwise benefitted

1   consumers is hindered, and Visa has no motivation to innovate. Indeed, Visa itself admits that it

2   has not significantly invested in innovation over the past decade aside from tokenization.

3       150. To be sure, the success of Visa's anticompetitive conduct is reflected in its control of the

4   market. By the end of 2022, Visa calculated that at least 75% of all its debit volume, and 80% of

5   its card-not-present debit volume, were insulated from competition. Moreover, Visa's routing

6   agreements with merchants and acquirers alone foreclose 45% of all United States debit volume;

7   this figure it even higher for card-not-present transactions.

8       151. At the expense of consumers, Visa has taken affirmative, intentional efforts to constrain

9   the vigorous competition that would act as a check on its prices and stimulate innovation.

10   Competition, not Visa, should control how consumers, merchants, and their respective banks

11   interact. Competition, not Visa, should govern innovation in the debit network marketplace. Most

12   importantly, competition, not Visa, should set the fees charged for network services, of which

13   consumers bear the highest burden.

14      152. To be sure, network fees are one of the highest costs of doing business for merchants.

15   Oftentimes, network fees are a merchants' third biggest expenses behind only labor and rent.

16   Swipe fees, thus, must be passed onto consumers.

17      153. It is well-known and recognized by merchants, the Department of Justice, and others that

18   network fees are passed onto consumers. Indeed, for many merchants, such as convenience stores,

19   grocers, and other food retailers, margins are in the single digits. These margins are around or

20   below the level of debit network fees the businesses must pay; thus, merchants must pass on their

21   debit network fees to consumers or else go out of business.

22      154. Consumers are unable to avoid this pass-through. Every time a consumer makes a

23   purchase, whether by debit, credit, or cash, they are subsidizing the supracompetitive network fees

24   imposed by Visa.

25   **IV.    No Countervailing Factors**

26      155. Visa's exclusionary, unlawful, and anticompetitive behavior lacks any legitimate,

27   procompetitive advantages that could outweigh the harm it inflicts on competition. Nor are there

28   benefits that could not be realized through less restrictive means. The anticompetitive clauses in

1   Visa's contracts and related actions are not essential to safeguard its technology, promote customer

2   expansion, deter free-riding, or accomplish any other purported advantage. Visa could pursue any

3   valid procompetitive goals without resorting to the restrictive terms being contested in this case;

4   in fact, less restrictive methods are available to Visa to achieve those goals. Further, Visa's

5   agreements with existing and potential direct competitors do not function as mere adjuncts to its

6   vertical relationships; instead, they act as clear divisions within the relevant markets among direct

7   competitors.

8   **V.      Relevant U.S. Debit Markets**

9        156. Courts define a relevant market, which has both a geographic and product market

10  dimension, to help identify the lines of commerce and areas of competition impacted by alleged

11  anticompetitive conduct. There can be multiple relevant markets covering the same or similar

12  products and services, and markets need not have strict boundaries.

13       157. Here, there are two relevant markets: (1) the market for general-purpose debit network

14  services within the United States, and (2) the narrower, card-not-present debit network services

15  market, which is subsumed by the former.

16       **A.      The United States is a Relevant Geographic Market**

17       158. The United States is a relevant geographic market. Federal laws and regulations

18  governing debit transactions, including card-not-present transactions, operate on a nationwide

19  level. Visa structures its U.S. debit network services market accordingly, as seen in its distinct

20  rules for merchant acceptance in the U.S. and its unique pricing for debit services, including card-

21  not-present transactions, tailored for merchants, acquirers, and issuers in the country. Network

22  services outside the United States are not viable alternatives to the primary market participants,

23  including consumers, issuers, acquirers, and merchants. As a result, a company serving as the sole

24  provider of general-purpose debit network services or card-not-present debit network services

25  within the United States would have the power to sustain prices above those typical in a

26  competitive market.

27

28

**B.    Relevant Product Markets**

159. The two relevant product markets are: (1) the general-purpose debit network services market, and (2) the general-purpose card-not-present debit network services market.

**1.    General Purpose Debit Network Services Market**

160. General purpose debit network services are products and services that facilitate the debit and transfer of consumers' bank account funds, typically using a credential or other account number to identify the consumer. Visa and other fintech debit competitors provide products and services that are inputs to and that enable debit transactions. They compete to provide debit network services for general purposes, meaning that their debit credentials are accepted at numerous, unrelated merchants. Debit network providers, such as Visa, sell their services to both issuers and acquirers, or in the case of some alternative debit networks, to consumers and merchants. Debit network providers service as the intermediary, or middlemen, between consumers and merchants, operating two-sided transaction platforms that facilitate the transactions between consumers and merchants, and their respective banks. These services represent a relevant product market.

161. Debit networks, like Visa, provide a host of services that enable debit transactions; collectively, these services constitute a market that is jointly used by consumers and merchants, and their respective banks. These services include the ability for the consumer to dispute and chargeback a transaction; payment guarantees for merchants; fraud protection; as well as the "rail" or methods the parties to a transaction use to communicate and facilitate the debit and transfer of a consumer's funds to the merchant. These minimum attributes of debit are important to consumers, merchants, and their respective banks alike and distinguish debit transactions from other methods of payment. While consumers do not contract directly with Visa, consumers (and their respective banks) rely on Visa and other networks to make it possible for them to purchase goods and services.

162. Debit networks are a two-sided platform that exhibit a high degree of interdependency between consumers (and the issuing banks) on one side, and merchants (and the acquiring banks) on the other. Consumers get more value from a network that connects to more merchants because

35

1    that increases whom and where they may purchase goods and services from. Likewise, merchants

2    get more value from a network that connects to more consumers because that increases the number

3    of persons they may sell their goods and services to.

4       163. General purpose debit network services are a relevant product market under the antitrust

5    laws. Consumers would not find other payment services to be a viable alternative to debit. As a

6    result, issuing banks do not consider alternative payment services to be a viable alternative to debit

7    because consumers value debit; merchants do not consider alternative payment services to be a

8    viable alternative because they do not want to lose sales by not accepting consumers' preferred

9    payment methods; and acquiring banks do not consider alternative payment services to be a viable

10   alternative because they do not want to lose their business with merchants. Thus, there are not

11   reasonable substitutes for general purpose debit network services, and a firm that was the only

12   seller of general purpose debit network services would be able to maintain prices above the level

13   that would prevail in a competitive market.

14      164.  The general purpose debit network services market includes the services sold by debit

15   networks other than traditional debit card networks. For example, fintech debit networks can be

16   accepted by all merchants that participate in the network and provide payment guarantees,

17   chargeback and dispute services, and fraud protection. While debit transactions facilitated by

18   fintech networks do not include a debit card issued to a consumer, the services provided by fintech

19   networks are functionally equivalent to consumers and merchants.

20      165. General purpose credit card network services are not a reasonable alternative or

21   interchangeable with debit network services because debit transactions withdraw funds direct from

22   the consumer's account, unlike credit transactions that draw from a line of credit. Visa described

23   debit as "pay now" product, and credit as a "pay later" product. The distinction between the two

24   forms of payment is widely recognized and accepted in the industry. Indeed, Visa and other

25   debit/credit networks offer different pricing for debit and credit transactions. Further, regulations,

26   such as the Durbin Amendment's limitations of issuer transaction fees do not apply to credit. Many

27   consumers either do not qualify for credit cards or strongly prefer using their existing funds over

28   incurring debt, making issuers unlikely to substitute credit for debit.

### 2.    General Purposes Card-Not-Present Network Services Market

166. While general purpose debit network services cover all debit transactions, narrow submarkets within this category exist. One such submarket, recognized by Visa itself, is the general purpose card-not-present debit network services market, which primarily relates to e-commerce.

167. This market includes both traditional debit card and fintech debit transactions, enabling consumers to pay various merchants for goods and services directly from their bank account.

168. General purpose card-not-present debit network services is a relevant product market under the antitrust laws. Market participants do not find other payment services to be a reasonable substitute for card-not-present debit. To be sure, there are particularly few even potential alternatives to card-not-present debit transactions, given that cash is not an option for online, e-commerce, or other card-not-present situations. There are not reasonable substitutes for card-not-present debit transactions. A firm that was the only provider of general purpose card-not-present debit network services could raise and maintain prices above the level that would apply in a competitive market.

## VI.    Visa Has Monopoly Power in the U.S. Debit Markets

169. Visa holds a monopolistic position in the general purpose debit network services market and the general purpose card-not-present network services market in the United States, with market shares exceeding 60% and 65%, respectively, based on payment volume. The next largest debit provider, Mastercard, pales in comparison with less than 25% of the payment volume in either market. No other network services provider for either market captures more than a single-digit percentage of debit volume.

170. Visa's monopoly power in the relevant debit markets stems from its ability to manipulate prices and suppress competition.

171. Visa has maintained its monopoly-level pricing, as evidenced by its exceptionally high profit margins. Visa's operating margins in North America are 83%, which is driven primarily by its United States debit business. Visa's profit margins substantially exceed most other publicly traded companies and are a major increase since Visa initially went public in 2007.

172. Visa has effectively blocked competition in both debit markets, as evidenced by its consistently high market shares and despite regulatory shifts. While Visa saw a brief market share reduction in 2011 (to 63%) and 2012 (to 56%) immediately following the passing and implementation of the Durbin Amendment, Visa's countermeasures ensured it quickly rebounded, and Visa has consistently grown its market share over the past decade. For example, in preparation for the Durbin Amendment going into effect, Visa started signing contracts with merchants and acquirers, ensuring that almost all of their Visa-eligible volume would be routed to Visa. Since the Durbin Amendment, Visa has used similar tactics, as well as other strategies like leveraging its market share and threatening fees and penalties to maintain, protect, and build its empire.

173. Despite recent clarifications from the Federal Reserve under Regulation II, requiring issuing banks to enable at least one back-of-card network unaffiliated with the front-of-card network for card-not-present transactions, Visa's market share was unaffected.

174. In addition to high profit margins and sustained market share, other factors confirm Visa's monopoly power in the relevant debit markets.

175. In contrast with smaller PIN networks, Visa and Mastercard are accepted by nearly every U.S. merchant that processes debit payments, regardless of whether the majority of their revenue comes from card-present or card-not-present transactions. No matter which debit cards consumers use, merchants consider both Visa and Mastercard indispensable and accept both networks to maximize their sales opportunities. Visa accordingly has significant leverage over merchants; merchant cannot simply abandon Visa when faced with price hikes or unfavorable terms. Instead, they must accept them and cover the additional costs by raising the prices consumers pay for their goods and services. Additionally, debit networks face barriers to entering and growing their business in the market, including regulation and brand recognition.

176. Merchants and acquiring banks are more inclined to absorb and pass-on the costs of enabling and complying with networks that handle a large enough volume to justify the costs. Losing some potential sales because of price hikes is preferred over losing an entire population of consumers who rely on Visa-branded debit cards to make their purchases. Likewise, issuers prefer to enable networks widely accepted by merchants because that increases consumers' options and

1  makes their bank more appealing. Visa knows that smaller, rival networks lack the necessary scale

2  on both sides of the market. The market's two-sided structure makes it difficult to gain widespread

3  enablement without already having broad acceptance, creating the network effects feedback loop

4  outlined above. This network effects is a significant barrier to entry and growth in the market.

5      177. Issuing banks typically offer only one front-of-card network, which usually includes a

6  long-term contract with the network provider (most commonly Visa, but also Mastercard). Issuing

7  banks rarely switch front-of-card networks because the process is costly, difficult, and can cause

8  a negative consumer experience. This further solidifies Visa's dominance, limiting Mastercard's

9  and other potential front-of-card network competitors from entering, expanding, or competing in

10 the market.

11     178. Visa recognizes and exploits these barriers, including switching costs and network effects,

12 to retain its market dominance and stifle would-be competitors that could disrupt their

13 monopolistic position. For example, in 2023, Visa threatened issuers with financial penalties if

14 they enabled new features from competing PIN networks that led to a reduction in Visa's debit

15 network volume. Around this time, Federal Reserve regulations required issuers to enable at least

16 two unaffiliated networks for card-not-present transactions. Previously, issuers had relied solely

17 on the front-of-card network (e.g., Visa) to process these transactions. In response to the threat of

18 merchants and acquiring banks adopting their rivals' PIN-less capabilities, Visa urged – with an

19 accompanying clarification that the failure to listen would result in higher fees and penalties –

20 issuing banks to disable PIN-less functions for card-present transactions. These penalties would

21 act as an indirect price increase for issuers, one they could not easily avoid due to the costs

22 associated with switching front-of-card network. This tactic allows Visa to expand the volume of

23 non-contestable transactions, furthering its leverage over market participants.

24     179. Visa has the power to set prices without concern over actual costs. Further, Visa engages

25 in price discrimination across different industry sectors, offering pricing differences unrelated to

26 the costs of providing services.

27     180. Visa has also been able to introduce new, less favorable pricing models without losing

28 debit volume. For example, in 2012, Visa launched its monthly FANF across all merchants and

1  acquirers. Similarly, in October 2023, Visa implemented a mandatory Digital Commerce Service

2  fee, which combined several previously optional value-added service fees into one for card-not-

3  present transactions. Visa projects roughly a five-times boost in network revenue from this

4  mandatory fee in contrast to the revenue earned from the previously optional fees. Despite a major

5  price increase on merchants and acquirers, Visa anticipated no impact on its debit volume.

6  Merchants, and particularly those with narrow margins, were resultantly forced to roll these new

7  fees into their prices for goods and services. In other words, consumers paid the price of the fee

8  hikes.

9  **VII.    Class Allegations**

10  181. Plaintiff brings this action individually and on behalf of all other similarly situated

11  persons under Federal Rule of Civil Procedure 23(a) and (b)(2), as representatives of a Class of

12  indirect purchasers seeking injunctive relief ("Injunctive Relief Class") defined as follows:

13
14  > Any person in the United States who purchased goods or services with a general purpose Visa-Branded Debit Card[7] during the period from the applicable limitations period through the present and indirectly paid Visa network fees.

15
16  182. Plaintiff brings this action individually and on behalf of all others similarly situated

17  persons under Federal Rule of Civil Procedure 23(a), (b)(3), and/or (c)(5) as representatives of a

18  Class seeking damages for violations of state antitrust and consumer protection laws ("State Law

19  Damages Class"), defined as follows:

20  > Any person in the United States who purchased goods or services for personal, family, or household purposes with a general purpose Visa-Branded Debit Card during the Class Period in Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New

21
22

23  ---
   [7] "Visa-Branded Debit Card" means a Debit Card that bears or uses the name Visa, Plus, Interlink,
24  or any other brand name or mark owned or licensed for use by Visa, or that is issued under any
   such brand or mark. "Debit Card" means any card, plate, or other payment code, device, credential,
25  account, or service, even when no physical card is issued that is used for one or multiple
   transactions – including, without limitation, a plastic card, a mobile phone or other mobile
26  communications device, a fob, a home assistant or other internet-connected device, or any other
   current or future code, device, credential, account, or service by which a person can pay for goods
27  or services – that is issued or approved for use through a payment network to debit an asset or
   deposit account, or that otherwise is not a Credit Card, regardless of whether authentication is
28  based on signature, PIN, or other such means (or no means at all), and regardless of whether or not
   the issuer holds the account (such as decoupled debit).

Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.[8]

183. The Classes are so numerous that joinder of all members would be impracticable. While the exact number of Class members is unknown, given the commerce at issue, the prevalence of Visa debit cards, and Visa's significant market share, there are likely millions of Class Members.

184. Plaintiff's claims are typical of those of the Classes.

185. Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiff are in accordance with those of the Classes.

186. Questions of law and fact common to the members of the Classes will prevail over questions, should they arise, that may be specific to individual Class members because Visa has acted on grounds generally applicable to the Classes.

187. Questions of law and fact common to the Classes include, but are not limited to:

a. Whether Visa intentionally and unlawfully impaired or impeded competition in the relevant market;

b. Whether Visa maintained or enhanced monopoly power in the relevant market;

c. Whether Visa engaged in anticompetitive conduct in order to disadvantage competitors and dissuade competition to maintain monopoly power in the relevant market;

d. Whether Visa had monopoly power in the relevant market;

e. Whether Visa had procompetitive reasons for its conduct;

f. The effects of Visa's anticompetitive conduct on network fees, interchange fees, and retail prices;

g. Whether Plaintiff and class members have been overcharged and thus damages as a result of Visa's unlawful behavior;

h. The appropriate declaratory and injunctive relief for the Classes; and

i. The proper measure of damages.

188. Class action treatment is superior to individual actions and the fair and efficient adjudication of the controversy because such treatment will permit a large number of similarly

---

[8] For purposes of defining the Class Period for the State Law Damages Class, the Class Period will extend back to the relevant statute of limitation period for the respective state law claim plus tolling where applicable.

situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the need for unnecessary duplicative efforts and expenses. The benefits of proceeding as a class action, including providing injured persons with a method for obtaining relief for claims that might not be practicable to pursue individually substantially outweighs any difficulties that may arise in connection with managing this class action.

189. Plaintiff knows of no difficulty to be encountered in the maintenance of this action as a class action.

## CAUSES OF ACTION

### COUNT I: INJUNCTIVE RELIEF

**For Violations of the Sherman Act, 15 U.S.C. § 2**
**(On Behalf of the Nationwide Injunctive Relief Class)**

190. Plaintiff incorporates each prior paragraph as if set forth herein.

191. With respect to the two relevant markets related to debit transactions in the United States: (1) the market for general purpose debit network services; and (2) the market for general purpose card-not-present debit network services, Visa has engaged in a continuing scheme with the purpose and effect of acquiring, enhancing, and maintaining monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

192. As a material and proximate result of Visa's unlawful conduct, Plaintiff suffered injury to their property. These injuries include, but are not limited to, paying Visa's supracompetitive network fees that were passed through into the prices of goods and services. Plaintiff was also deprived of the benefits of free and open competition.

193. Plaintiff is threatened with future injury to their property unless Defendants are enjoined from further unlawful conduct.

194. Plaintiff accordingly seeks equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects for not continue or reoccur in the future.

**COUNT II: VIOLATIONS OF STATE ANTITRUST LAWS**

**(On Behalf of the State Law Damages Class)**

195. Plaintiff incorporates each prior paragraph as if set forth herein.

196. In addition to violating Section 2 of the Sherman Act, Visa intentionally and wrongfully maintained, attempted to maintain, and/or conspired to maintain monopoly power in the relevant markets.

197. Be engaging in the foregoing conduct, Visa intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in the violation of the following state antitrust laws:

    a. Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of goods and services in Arizona by Class members and/or Arizona residents.

    b. Ark. Code Ann. §§ 4-75-208, *et seq.*, with respect to purchases of goods and services in Arkansas by Class members and/or Arkansas residents.

    c. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases of goods and services in California by Class members and/or California residents.

    d. D.C. Code §§ 28-4501, *et seq.*, with respect to purchases of goods and services in the District of Columbia by Class members and/or District of Columbia residents.

    e. Haw. Rev. Stat §§ 480-1, *et seq.*, with respect to purchases of goods and services in Hawaii by Class members and/or Hawaii residents.

    f. 740 Ill. Comp. Stat. Ann. 10/3(1), *et. seq.*, with respect to purchases of goods and services in Illinois by Class members and/or Illinois residents.

    g. Iowa Code §§ 553.1, *et seq.*, with respect to purchases of goods and services in Iowa by Class members and/or Iowa residents.

    h. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of goods and services in Kansas by Class members and/or Kansas residents.

    i. Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*, with respect to purchases of goods and services in Maine by Class members and/or Maine residents.

    j. Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of goods and services in Michigan by Class members and/or Michigan residents.

    k. Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of goods and services in Minnesota by Class members and/or Minnesota residents.

    l. Miss. Code Ann. §§ 74-21-1, *et seq.*, with respect to purchases of goods and services in Mississippi by Class members and/or Mississippi residents.

m.  Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of goods and services in Nebraska by Class members and/or Nebraska residents

n.  Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of goods and services in Nevada by Class members and/or Nevada residents.

o.  N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et seq.*, with respect to purchases of goods and services in New Hampshire by Class members and/or New Hampshire residents.

p.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of goods and services in New Mexico by Class members and/or New Mexico residents.

q.  N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of goods and services in New York by Class members and/or New York residents.

r.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of goods and services in North Carolina by Class members and/or North Carolina residents.

s.  N.D. Cent. Code §§ 51-08.1, *et seq.*, with respect to purchases of goods and services in North Dakota by Class members and/or North Dakota residents.

t.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of goods and services in Oregon by Class members and/or Oregon residents.

u.  R.I. Gen Laws §§ 6-36-1, *et seq.*, with respect to purchases of goods and services in Rhode Island by Class members and/or Rhode Island residents.

v.  S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of goods and services in South Dakota by Class members and/or South Dakota residents.

w.  Tenn. Code §§ 47-25-101, *et seq.*, with respect to purchases of goods and services in Tennessee by Class members and/or Tennessee residents.

x.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of goods and services in Utah by Class members and/or Utah residents.

y.  W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of goods and services in West Virginia by Class members and/or West Virginia residents.

z.  Wis. Stat. Ann. §§ 133.01(1), *et seq.*, with respect to purchases of goods and services in Wisconsin by Class members and/or Wisconsin residents

198. Plaintiff and Class members seek damages as permitted by law for their injuries caused by Visa's violations of the respective statutes.

**COUNT III: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

**(On Behalf of State Law Damages Class)**

199. Plaintiff incorporates each prior paragraph as if set forth herein.

200. By engaging in the unfair and unlawful conduct alleged herein with respect to purchases in the below respective States and/or purchases made by residents of the below States, Visa violated the following state consumer protection laws:

    a. Ariz. Rev. Stat. §§ 44-1521, et seq., with respect to purchases of goods or services with a Visa debit card in Arizona by Class members and/or Arizona residents.

    b. Ark. Code §§ 4-88-101, et seq., with respect to purchases of goods or services with a Visa debit card in Arkansas by Class members and/or Arkansas residents.

    c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases of goods or services with a Visa debit card in California by Class members and/or California residents.

    d. Colo. Rev. Stat. §§ 6-1-101, et seq., with respect to purchases of goods or services with a Visa debit card in Colorado by Class members and/or Colorado residents.

    e. D.C. Code §§ 28-3901, et seq., with respect to purchases of goods or services with a Visa debit card in the District of Columbia by Class members and/or District of Columbia residents.

    f. Fla. Stat. §§ 501.201, et seq., with respect to purchases of goods or services with a Visa debit card in Florida by Class members and/or Florida residents.

    g. Haw. Rev. Stat. §§ 481-1, et seq., with respect to purchases of goods or services with a Visa debit card in Hawaii by Class members and/or Hawaii residents.

    h. Idaho Code Ann. §§ 48-601, et seq., with respect to purchases of goods or services with a Visa debit card in Idaho by Class members and/or Idaho residents.

    i. 815 Ill. Comp. Stat. Ann. 505/1, et seq., with respect to purchases of goods or services with a Visa debit card in Illinois by Class members and/or Illinois residents.

    j. Kan. Stat. Ann. §§ 50-623, et seq., with respect to purchases of goods or services with a Visa debit card in Kansas by Class members and/or Kansas residents.

    k. Me. Stat. Tit. 5, §§ 205-A, et seq., with respect to purchases of goods or services with a Visa debit card in Maine by Class members and/or Maine residents.

    l. Mass. Gen. Laws Ch. 93A §§ 1, et seq., with respect to purchases of goods or services with a Visa debit card in Massachusetts by Class members and/or Massachusetts residents.

m. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to purchases of goods or services with a Visa debit card in Minnesota by Class members and/or Minnesota residents.

n. Mo. Rev. Stat. §§ 407.010, et seq., with respect to purchases of goods or services with a Visa debit card in Missouri by Class members and/or Missouri residents.

o. Mont. Code §§ 30-14-103, et seq., and Mont. Code §§ 30-14-201, et seq., with respect to purchases of goods or services with a Visa debit card in Montana by Class members and/or Montana residents.

p. Neb. Rev. Stat. §§ 59-1602, et seq., with respect to purchases of goods or services with a Visa debit card in Nebraska by Class members and/or Nebraska residents.

q. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases of goods or services with a Visa debit card in Nevada by Class members and/or Nevada residents.

r. N.M. Stat. Ann. §§ 57-12-1, et seq., with respect to purchases of goods or services with a Visa debit card in New Mexico by Class members and/or New Mexico residents.

s. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases of goods or services with a Visa debit card in New York by Class members and/or New York residents.

t. N.C. Gen. Stat. §§ 75-1.1, et seq., with respect to purchases of goods or services with a Visa debit card in North Carolina by Class members and/or North Carolina residents.

u. N.D. Cent. Code §§ 51-10, et seq., with respect to purchases of goods or services with a Visa debit card in North Dakota by Class members and/or North Dakota residents.

v. R.I. Gen. Laws 6-13.1-1, et seq., with respect to purchases of goods or services with a Visa debit card in Rhode Island by Class members and/or Rhode Island residents

w. S.C. Code Ann. §§ 39-5-10, et seq., with respect to purchases of goods or services with a Visa debit card in South Carolina by Class members and/or South Carolina residents.

x. Tenn. Code Ann. §§ 47-18-101, et seq., with respect to purchases of goods or services with a Visa debit card in Tennessee by Class members and/or Tennessee residents.

y. Utah Code Ann. §§ 13-11-1, et seq., with respect to purchases of goods or services with a Visa debit card in Utah by Class members and/or Utah residents.

z. Vt. Stat. Ann. Tit. 9, §§ 2453, et seq., with respect to purchases of goods or services with a Visa debit card in Vermont by Class members and/or Vermont residents.

aa. W. Va. Code §§ 46A-6-101, et seq., with respect to purchases of goods or services with a Visa debit card in West Virginia by Class members and/or West Virginia residents.

bb. Wis. Stat. §§ 100.20, et seq., with respect to purchases of goods or services with a Visa debit card in Wisconsin by Class members and/or Wisconsin residents.

201. On behalf of themselves and the State Law Damages Class, Plaintiff seeks all appropriate relief provided for under the above states.

### RELIEF SOUGHT

202. Plaintiff requests judgment including the following relief:

    a.   A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel of records as Class Counsel.

    b.   Permanent injunctive relief invaliding Visa's exclusivity, routing, volume commitments, and any other anticompetitive agreements with issuers, merchants, and acquirers.

    c.   Damages under the relevant state antitrust and/or consumer protection statutes for Visa's wrongful conduct as alleged herein.

    d.   Plaintiff's and the Classes' costs, expenses, and reasonable attorneys' fees.

    e.   Such other relief in equity or at law as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury of all issues so triable.

DATED: December 2, 2024                Respectfully submitted,

**HARTLEY LLP**

*s/Jason S. Hartley*
Jason S. Hartley
Jason M. Lindner
101 W. Broadway, Suite 820
San Diego, California 92101
Tel: (619) 400-5822
*hartley@hartleyllp.com*
*lindner@hartleyllp.com*

*Attorneys for Plaintiff*

47
CLASS ACTION COMPLAINT